## AUBURN NEWS COMPANY, INC. et al.

### v.

## PROVIDENCE JOURNAL COMPANY et al.

### Civ. A. No. 80–0446.

United States District Court,
D. Rhode Island.

Nov. 14, 1980.

---

Frank Licht, Richard A. Licht, Letts, Quinn & Licht, and Leonard DeCof, Providence, R.I., for the plaintiffs.

Edward F. Hindle, Joseph Cavanagh, Jr., Edwards & Angell, Providence, R.I., Daniel C. Kaufman, King & Ballow, Nashville, Tenn., for defendants.

## OPINION

FRANCIS J. BOYLE, District Judge.

This action concerns alleged violation of Sections One and Two of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2 (1976), alleged violation of the analogous Rhode Island Antitrust statutes, R.I. Gen. Laws § 6–36–1, *et seq.* (Supp.1980), as well as an alleged breach of the common law duty not to wrongfully interfere with contractual relationships. The Plaintiffs seek a Preliminary Injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure.

## THE PARTIES

Plaintiffs are eighteen independent distributors who purchase at wholesale Defendants' newspapers and a much smaller number of out–of–town newspapers and distribute those newspapers by direct sale or through home delivery carriers in precisely delineated areas whose boundaries are strictly observed. Defendant, The Providence Journal Company (hereinafter, the Journal), is the publisher of *The Providence Journal, The Evening Bulletin, The Providence Journal–Bulletin,* and *The Providence Sunday Journal.* These newspapers circulate throughout Rhode Island and in parts of Southeastern Massachusetts. *The Providence Journal* is the only morning newspaper published and sold in Rhode Island. *The Providence Journal–Bulletin* is the only Saturday morning newspaper published and sold in Rhode Island. *The Providence Sunday Journal* is the only Sunday morning newspaper published and sold in Rhode Island. Only *The Evening Bulletin* is subject to direct competition from other Rhode Island local newspapers.

## FACTUAL BACKGROUND

For many years the Journal distributed its newspapers by selling to distributors who in turn sold to stores and home delivery carriers. Through the years the boundaries of each distribution area crystalized. In essence, the market for sale of the Journal's papers was divided into distributorships. There is testimony to indicate the territorial division was maintained not by any coercion of the Plaintiffs or Defendants, but by a mutual understanding that it was the most efficient and effective way to conduct business.

In 1973 the Journal decided to attempt to acquire some of these independent distributorships and distribute its newspapers itself. In furtherance of this goal Southern New England News Distributors, Inc. (hereinafter Southern New England) was formed. Southern New England was a wholly owned subsidiary of the Journal.

In March, 1973, a meeting of independent distributors was called by Mr. Koehler, the Journal's circulation director. Mr. Koehler and the independent distributors met at a country club for breakfast. The purpose of the meeting was to announce a change in the Journal's policy. From that point on, the Journal would not recognize distributorships sold to anyone other than Southern New England. The Journal would buy the distributorships at "fantastic" prices, starting at a 100% increase over the cost and going "all the way to 800–900% and/or over." In effect, the Journal would not sell its product to any new distributors. When one of the distributors asked if he would be permitted to sell his business to a son or daughter, the Journal spokesman stated that a sale to a member of a distributor's immediate family would be proper.

The apparent rigidity of the Journal's new policy was not always followed. Following the breakfast meeting, some distributorships were sold to persons who were not members of the immediate family of a distributor.

Sometime in late 1979 or early 1980, the Journal decided to step up its plan for in-house distribution of its newspapers. There is evidence that the Journal's decision was based on a number of business reasons including: the ability to control price; the ability to obtain detailed information on subscribers and nonsubscribers; direct access to the carrier or store owner; and the ability to improve market penetration. Further, the Journal had outside management consultants' advice.

On the other hand, there is evidence of a different scenario. Plaintiffs point to evidence which indicates the studies and reports of the Journal succeeded the decision to distribute directly, that the studies and reports were generated thereafter only to provide a basis for arguing the decision to go in–house was founded on sound business reasons and not anti–competitive intent.

In a letter dated August 11, 1980, the Journal informed all distributors that as of September 6, 1980, the Journal would no longer sell its newspapers at wholesale rates to independent distributors. The letter

went on to invite the distributors to discuss a price for their distributorship with the Journal. Of the thirty–two independent distributors at the time of the August 11 letter, fourteen sold to the Journal. Plaintiffs are those distributors who did not sell. The Journal also published in its newspapers advertisements notifying home delivery carriers, including those who purchased from Plaintiffs, that they "must" contact the Journal if they wished to continue delivering the Journal's papers.

On September 5, 1980, this Court issued a Temporary Restraining Order, pursuant to Fed.R.Civ.P. 65(b), in effect compelling the Journal to continue to sell to the Plaintiffs. On September 24, 1980, a hearing began on the issue of whether a preliminary injunction should issue. Seven days of testimony followed and the issues were extensively briefed.

## PRELIMINARY INJUNCTION

The decision to issue a preliminary injunction traditionally rests upon an examination of four factors: 1) the likelihood Plaintiffs will suffer irreparable harm; 2) the balance of this harm with the harm Defendants will suffer if they are enjoined; 3) the probability Plaintiffs will succeed on the merits; and 4) the public's interest in issuing an injunction. See Wright & Miller, *Federal Practice & Procedure: Civil* § 2948 (1973).

## IRREPARABLE HARM

■ Plaintiffs claim they will suffer irreparable harm if the Journal is permitted to refuse to deal with them in that they will be forced out of business. The Journal argues that even if wrongdoing is ultimately found, money damages, easily determined, with a provision for treble damages in an antitrust action, provide an adequate remedy at law, removing the need for, and indeed requiring the denial of any interlocutory relief.

Distribution of Journal newspapers is the life blood of these Plaintiffs.[1] The uncontradicted testimony is that the Plaintiffs' businesses will fold without the opportunity to distribute the Journal's papers. Indeed, the evidence is that the Journal required the independent distributors to devote full time to their businesses. Defendants themselves recognized the significance of the Journal's papers to Plaintiffs: distribution of the Journal's papers was a full time job.

Defendants argue, however, that there is an adequate remedy at law, namely money damages. Defendants point to the sale price of the distributorships as the easily determined measure of damages and argue that three times that amount is clearly an adequate remedy. The argument proves too much.

Theoretically, this argument has an apparent validity. Should Plaintiffs recover upon their theory for violation of the Sherman Act, they would be entitled not only to recover actual damages but three times their actual damage. 15 U.S.C. § 15 (1976). There are a number of real impediments to a translation of this theory into fact. Since Defendants intend to assume Plaintiffs' businesses of newspaper distribution, the real result would be that Defendants have purchased Plaintiffs' businesses, at a price determined by the Court. This result would have the effect of converting this action into a kind of private eminent domain proceeding not sanctioned by either constitutional or statutory authority.

There is also an effect upon others who are not parties to this action. At the present time Plaintiffs supply those large numbers of newspaper carriers and stores who sell Defendants' goods directly to the consumer. Although there are no written contracts with Plaintiffs, there is a natural reliance by those newspaper carriers and stores who distribute Defendant Journal's newspapers to the ultimate consumer upon the ability of the Plaintiffs to provide them with newspapers for sale. Plaintiffs have

1. While other papers are distributed by some of these independent distributors, it can be said their contribution to the total is *de minimis.*

acquired or created and maintain a system of distribution involving hundreds of people, including many enterprising and hard working entrepreneurs between the ages of twelve and seventeen. Any disruption of supply would effectively terminate those businesses as effectively as it will terminate Plaintiffs' businesses. Any expectation that those relationships could be successfully resumed, after a hiatus, is not within the realm of reality. Defendants have actively solicited Plaintiffs' carriers to form a direct relationship with Defendants. An attempt to resuscitate these independent distributor–carrier business relationships while Defendant Journal is the sole source of supply would be a hope doomed to fail.

There is a further factor. Although compensation for damages to parties injured by a violation of the Sherman Act may provide a substitute for the interest of those parties, damages cannot restore competition, and, in a sense, damages merely serve to thwart the lofty purpose of the Sherman Act. This is not to say that every alleged violation of the Sherman Act necessarily requires equitable relief, but preserving the existence of competitive forces it is a fact which, in balance, must be given some deference.

Thus, Defendants fail to recognize the elimination of one's livelihood, the extinguishment of an entrepreneur's spirit and the disruption of existing business relationships cannot be measured by money alone. *Engine Specialists, Inc. v. Bombardier Ltd.,* 454 F.2d 527 (1st Cir. 1972); *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205–06 (2d Cir. 1970); *Paschall v. Kansas City Star Co.,* 441 F.Supp. 349, 356–57 (W.D.Mo.1977).

## COMPARATIVE HARM

The Court must balance the harm to be suffered by Defendants, should an injunction issue, and the harm to be suffered by Plaintiffs should it not issue. We begin with an observation: The Journal has operated with a system of independent distributors for a number of years. An injunction *pendente lite* would merely maintain the status quo until there is a full hearing on the merits. Thus, when balanced against the potential harm to be suffered by Plaintiffs, Defendants' argument pales. Moreover, there is evidence indicating Defendants would only gradually adopt its desired plan of distribution, that is, the change over would take a number of months to complete. The Court concludes Plaintiffs possess a greater risk of harm.

## THE PUBLIC INTEREST

That the public's interest is furthered by the prevention of a violation of the antitrust statutes is beyond dispute. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969).

## PLAINTIFFS' PROBABILITY OF SUCCESS

That the issuance of a prohibitory injunction is a drastic remedy is also beyond dispute. Consequently, equity has traditionally required the moving party to demonstrate at a preliminary hearing that it will probably succeed at a trial on the merits. There is astoundingly little authority which discusses precisely the implications of this standard.

The trend in more recent decisions is to adopt the alternative test articulated first in the Second Circuit. *See, e. g., United States v. Bedford Associates,* 618 F.2d 904 (2d Cir. 1980); *Wainwright Securities, Inc. v. Wall Street Transcript Corp.,* 558 F.2d 91 (2d Cir. 1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978). The standard of this line of decisions is as follows: where other factors—such as the potential for harm to be suffered by plaintiff and the lack of a similar potential harm for defendant—are strong, the plaintiff need not make as persuasive a showing that he is likely to succeed on the merits. *Productos Carnic, S. A. v. Central American Beefland Seafood Trading Co.,* 621 F.2d 683, 686 (5th Cir. 1980); *accord, Fox Valley Harvestore, Inc. v. A. O. Smith Harvestore Products, Inc.,* 545 F.2d 1096, 1098 (7th Cir.

1976); *Federal Leasing, Inc. v. Underwriters at Lloyd's*, 487 F.Supp. 1248, 1261 (D.Md.1980); *Hawaii Psychiatric Society District Branch of American Psychiatric Association v. Ariyoshi*, 481 F.Supp. 1028, 1036 (D.Hawaii 1979).

The First Circuit has indicated approval of a balancing approach to the question of ultimate success on the merits. *National Tank Truck Carriers, Inc. v. Burke*, 608 F.2d 819, 823 (1st Cir. 1979); *Tuxworth v. Froehlke*, 449 F.2d 763, 764 (1st Cir. 1971). This Court has squarely addressed the issue:

> [i]f the balance of hardships tips decidedly toward the plaintiff, it is ordinarily sufficient that the plaintiff has raised questions going to the merits which are so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus, for more deliberate investigation.

*Silva v. East Providence Housing Authority*, 390 F.Supp. 691, 696 (D.R.I.1975) (quoting *Palmigiano v. Travisono*, 317 F.Supp. 776, 787–88 (D.R.I.1970) (Pettine, J.)).

This approach makes eminent good sense in view of the fact that, strictly speaking, requiring Plaintiffs to meet the "probability of success" standard virtually precludes a contrary fact finding upon hearing on the merits. The need to preserve the status quo is obvious if, absent relief, the controversy is likely to become moot pending a hearing on the merits as clearly appears to be the fact in this action. The analysis of the facts and applicable law which follows establishes that Plaintiffs are entitled to the temporary relief which they seek based upon evidence which is believable, acknowledging at the same time the existence of contrary evidence and without at the same time any prejudgment of the facts as they might be ultimately found at a hearing on the merits.

## SECTION I CLAIMS

■ Plaintiffs charge Defendants with various violations of Section One of the Sherman Act which prohibits contracts, combinations and conspiracies in restraint of trade. 15 U.S.C. § 1 (1976). Plaintiffs allege the Journal and Southern New England combined to coerce Plaintiffs to maintain Defendant Journal's suggested retail price and that the acquisition of the fourteen independent distributors was in furtherance of this retail price maintenance scheme. Plaintiffs further allege Defendants established an illegal concerted refusal to deal when a decision was made to vertically integrate downstream, *i. e.*, when the Journal decided to enter, develop and ultimately envelop the secondary market of newspaper distribution. If established, these claims would amount to *per se* violations of the Sherman Act. *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *Klor's v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

With respect to the allegation of group boycott or concerted refusal to deal, Defendants first claim the Journal and Southern New England are incapable of the type of concerted activity forbidden by the antitrust laws. Defendants, while acknowledging their refusal to deal with Plaintiffs, assert the decision was a unilateral one involving no combination. Finally, Defendants claim that even if some sort of concerted activity is determined to exist or to have existed, such activity concerned a vertical arrangement and not a horizontal one thereby shielding the agreement from the harshness of *per se* analysis.

With reference to the retail price maintenance charge, Defendants argue first that they did not attempt to maintain price, but even if there were some incidents of price maintenance in the past, they would not be grounds for enjoining or compelling divestment in an otherwise proper vertical integration.

■ Southern New England is the distribution arm of the Journal. Southern New England has always been a wholly owned subsidiary of the Journal. Defendants point to these facts and assert their inability to combine in violation of § 1. Mere common ownership will not insulate entities from the reach of the Sherman Act. *Unit-*

ed States v. Citizens Southern National Bank, 422 U.S. 86, 116, 95 S.Ct. 2099, 2116, 45 L.Ed.2d 41 (1975); Kiefer–Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); United States v. Yellow Cab Co., 332 U.S. 218, 227, 67 S.Ct. 1560, 1565, 91 L.Ed. 2010 (1947). Further, the existence of a parent subsidiary relationship between the two entities by itself has little antitrust significance. Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 282 (1968); Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951). While it may well be that a corporate division cannot conspire with another division as an employee may not conspire with employer, Nelson Radio and Supply Co. v. Motorola, Inc., 200 F.2d 911 (5th Cir. 1952), cert. denied, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953); Lamarca v. Miami Herald Publishing Co., 395 F.Supp. 324 (S.D.Fla.), aff'd, 524 F.2d 1230 (5th Cir. 1975),[2] separate incorporation is another matter. The very purpose of incorporating a subsidiary is to memorialize a degree of separateness between the two entities. This is done for a number of reasons. For example, the Journal stated it was concerned with the threat of unionization of its distribution employees. The Journal's reasons for separately incorporating Southern New England are besides the point; the point is that at the instant Southern New England was incorporated, it had a separate legal existence.[3] It is, therefore, quite possible to find that the Journal and Southern New England conspired or combined with one another in contravention of § 1.[4]

Plaintiffs allege the existence of a combination the purpose of which was the maintenance of a Journal–determined maximum resale price. Plaintiffs claim the Journal combined with Southern New England as well as with the independent distributors themselves in furtherance of this price fixing scheme. For purposes of analysis, it is best to consider this allegation as it applies to separate time periods: before and after the August 11, 1980 termination letter.

## DEFENDANTS' CONDUCT BEFORE THE LETTER

■ Relying on Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) and applications of that opinion, Plaintiffs allege a combination between Defendants and between Defendants and the independent distributors to fix price.

Evidence was presented which, if believed by the ultimate finder of fact, would support a conclusion of price fixing. Mr. Proulx, the independent distributor in the Bristol, Rhode Island area testified that Journal's approval of him as franchisee was at least tacitly conditioned on his respect of the Journal's suggested retail price. When Mr. Proulx later raised the price of the papers to his carriers, he claims to have suffered late deliveries from the Journal. Plaintiff Brooks stated when she informed Mr. O'Neil of the Journal that due to increased costs of distribution she needed to raise her price for the papers, she was told she could not. Other Plaintiffs testified to similar occurrences.

The effect of such activity on the part of the Journal could only be coercive. Plaintiffs were organized and what was suffered by one distributor could be expected to be communicated to all distributors. The di-

---

**2.** Defendants point to Lamara and Millcarek v. Miami Publishing Co., 388 F.Supp. 1002 (S.D. Fla.1975) in support of their claim that they cannot conspire among one another. Lamarca and Millcarek involved an employee–employer relationship. The case at bar concerns independent contractors. Lamarca and Millcarek, therefore, are inapposite.

**3.** Indeed, there was evidence that at certain times the Journal and Southern New England were at cross purposes.

**4.** Knutson v. Daily Review, Inc., 383 F.Supp. 1346 (N.D.Cal.1974), aff'd in part rev'd in part on other grounds, 548 F.2d 795 (9th Cir. 1976), cert. denied, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977), upon which Defendants rely is not to the contrary. There the court found two newspapers to be mere extensions of a sole owner. That court further held there had been no proof of monopoly power, nor of coercive or predatory practices.

rect and natural result of such activity was communication to the independent distributors that if they did not comply with the Journal's wishes, disastrous repercussions would ensue. *Newberry v. Washington Post Co.*, 438 F.Supp. 470, 480–82 (D.D.C. 1977).

With the communication of this policy, cooperation followed. With few exceptions, the price suggested by the Journal was the price charged by the independent distributors and the home delivery carriers. Consequently, under this theory a combination in violation of § 1 can be established: When the distributors acquiesced to the wishes of the Journal, the combination was formed. *Albrecht*, 390 U.S. at 150 n.6, 88 S.Ct. at 872 n.6.[5]

In addition to the Plaintiffs themselves, it is quite possible to find that Southern New England combined with the Journal to coerce Plaintiffs with maintaining the Journal's price schedule. In 1973 Southern New England was formed. Its avowed purpose was to acquire distributorships from those who wished to sell. Undoubtedly an effect of its formation was to place Plaintiffs on notice that the Journal was quite capable of distributing its papers should any of the Plaintiffs fall in disfavor.

## DEFENDANTS' CONDUCT AFTER THE AUGUST 11, 1980, LETTER

Demonstrating a post termination price fix seems a more difficult task for Plaintiffs. For the same reasons, it appears less likely that Plaintiffs will be able to demonstrate Defendants' conduct was a *per se* violation of § 1 in the form of a concerted refusal to deal by Southern New England and the Journal.

First, the arrangement between Defendants is to be distinguished from the ordinary § 1 combination. Defendants represent a vertically integrated whole. As such, the decision not to sell to Plaintiffs but instead to sell only to Southern New England is best analyzed as an exclusive dealership rather than a group boycott. *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126 (2d Cir.) (en banc), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978); *See* Case Note, *Vertical Agreement to Terminate Competing Distributors*, 92 Harv.L. Rev. 1160 (1979).

The distinction is significant for while both arrangements may be anti–competitive, group boycotts are subjected to the rigors of *per se* analysis while exclusive dealerships are to be reviewed according to the more forgiving standards of the Rule of Reason. *Packard Motor Car Co. v. Webster Motor Car Co.*, 243 F.2d 418, 420 (D.C.Cir.), *cert. denied*, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957).

The reasons for the distinction is clear. Group boycotts involve horizontal agreements. For the vast majority of situations they further no competitive activity while at the same time stifling competitive forces of the market place. On the other hand exclusive dealerships and vertical arrangements in general, often are competitive in effect. Further, such competitive effects often offset any anti–competitive effects. *See, e. g., Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (exclusive territory arrangement whose competitive effect was the promotion of inter–brand competition and whose anti–competitive effect was the stifling of intra–brand competition was found reasonable). Thus, vertical arrangements justify the use of the Rule of Reason.

The Rule of Reason means that in determining whether there is an antitrust violation, a balancing must be performed: pro–competitive effects must be compared with anti–competitive effects. *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). Plaintiffs argue, and

---

**5.** Defendants' reliance on *Naify v. McClatchy Newspapers*, 599 F.2d 335 (9th Cir. 1979) and *Newberry v. Washington Post Co.*, 438 F.Supp. 470 (D.D.C.1977) is misapplied. In *Naify* there was no evidence of any attempt to maintain retail prices. Similarly in *Newberry*, with the exception of one instance, there was no evidence of coercion. Thus a combination could not be found.

the evidence indicates, that vertical integration will necessarily be the undoing of their businesses. The antitrust laws, however, protect competition, not competitors. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). Therefore, if the elimination of competitors from the market place is to have an anti–competitive effect their presence must be shown to have a pro–competitive effect. Plaintiffs concede they do not compete among themselves. Thus for the most part there is no competition in the secondary newspaper distribution market. Nonetheless, an anti–competitive effect might be caused by the elimination of Plaintiffs from this secondary market, for while out–of–state and other Rhode Island newspapers circulate throughout the State to only a minute degree, they possibly act as a competitive force since they are at least potential competitors. *See United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 93 S.Ct. 1036, 35 L.Ed.2d 475 (1973). Thus other newspapers could be said to be "waiting in the wings" thereby acting as a competitive check on the Journal. For example, if the Journal were to raise its price per copy or for advertising, these other papers might enter or expand their service of the market. The newspaper business, however, is a two–tier one: both publication and distribution of the product is required. Absent an independent distribution system, potential competitors would necessarily have to enter both markets simultaneously. Thus, an anti–competitive effect of the elimination from the market of Plaintiffs would be the entrenchment of Defendants and the raising of barriers to entry facing potential competitors of Defendants. *See*, Note, *Refusals to Deal by Vertically Integrated Monopolists*, 87 Harv.L.Rev. 1720, 1725–32 (1974); *cf. Hardin v. Houston Chronicle Pub. Co.*, 434 F.Supp. 54 (S.D.Tex.1977), aff'd, 572 F.2d 1106 (5th Cir. 1978) (no showing of monopoly power, coercion or anti–competitive effect).

Defendants on the other hand assert certain sound business reasons for their decision. One of Defendants' experts testified that newspapers derive the greatest proportion of their revenue from advertising. Advertising rates in turn are determined by circulation: the paper with the greater circulation will be able to command the better price for ads run in its paper. Various Journal witnesses testified that the goal of Defendants–to maximize circulation–was often at odds with Plaintiffs' objective to maximize profit on the sale of papers. Defendants argue that there are potential subscribers in rural parts of the market whom Plaintiffs are unwilling to service because the cost of delivering to these outlanders is too dear. Plaintiffs agree. Defendants further argue it would service these potential purchasers and that the marginal cost of such service would be justified by an increase in ad revenues due to the increase in circulation base. Plaintiffs agree. Plaintiffs, however, do not agree with Defendants' resolution of the tension caused by the apparent cross purposes of the parties. Defendants advocate, of course, vertical integration of the distribution system. Plaintiffs on the other hand believe an increase in their delivery cost allowance would be more appropriate.[6] Defendants' proposed solution yields the elimination of the independent distributors from the market place. Plaintiffs' does not.

Defendants also point to their new customers service system. This system will allow subscribers of the Journal to call the Defendants directly with any question concerning its newspapers, while at the same time allowing the Journal to keep more accurate data on its subscribers. While centralization may have its advantages, this system would mean a subscriber would call not the local distributor possibly located in the same town, but rather to a centralized, perhaps distant point. Further, the evidence did not indicate that the independent distributors could not be incorporated into this new program.

---

**6.** Defendants underwrite part of the cost of delivery for distributors whose area is rural.

In sum, it appears Plaintiff might well prove, under Rule of Reason analysis, Defendants violated § 1 when they decided to vertically integrate.

## SECTION 2

■ Plaintiffs allege Defendants monopolized the newspaper business and attempted to monopolize the newspaper delivery business in Rhode Island and by doing so violated § 2 of the Sherman Act. Monopoly does not occur in a vacuum. The first step, therefore, is a definition of the relevant product and geographic markets.

## PRODUCT MARKET

Plaintiffs assert Defendants produce a number of unique products: the only Sunday morning paper published in and distributed throughout the State, the only Rhode Island weekday and Saturday morning papers published in and distributed throughout the State, and the only Rhode Island evening weekday paper published in and distributed throughout the State. Only the evening weekday (Monday to Friday) paper is subject to direct competition from other locally published newspapers. In sum, Plaintiffs claim Defendants have a monopoly for the product market comprised of general circulation newspapers in the State.

Defendants view the situation from a somewhat different perspective. The thrust of their argument is that newspapers are best understood as a vehicle for advertisement rather than a commodity for sale. Defendants argue the Journal's products are by no means unique for they must compete with all other media for ad revenues. Defendants argue the other media must be considered in defining the product market.

■ When one gets down to brass tacks, or any other specific product, almost all products have substitutes: even buses, skywriters and road signs compete with newspapers for advertising. Antitrust law, however, is only concerned with products reasonably interchangeable with one another, in other words, products for which there is

some cross elasticity of demand. *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). So while buses, skywriters, road signs and newspapers may be in the same broad product market, it may well be that antitrust law is concerned only with the more narrow submarket of newspapers.

The boundaries of such submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

*Id.* at 325, 82 S.Ct. at 1523.

Traditionally, newspapers have been considered separate from other media. *Times Picayune Publishing Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951). Plaintiffs argue the relevant product submarket may be further narrowed to include only newspapers of general circulation. This may be so. Evidence presented and testimony given indicates other Rhode Island newspapers are more parochial in nature, *i. e.*, they are oriented more toward reporting local events.

The proper product submarket might be limited to newspapers of general circulation published in Rhode Island, *i. e.*, the Journal's newspapers alone. As one of Plaintiffs' experts testified, the Journal's newspapers were "unique" in the extent of coverage of Providence news, state news and other features.

## GEOGRAPHIC MARKET

■ The relevant geographic market is that area to which Plaintiffs can practically turn for the product. *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 627, 5 L.Ed.2d 580 (1961). Plaintiffs state the relevant geographic market to be Rhode Island. Considering the necessity for prompt delivery of newspapers and the need to provide information concerning

local events it would not seem practicable for distributors to look to Boston or New York for their product. The evidence was that the geographic market is the State of Rhode Island.

## MONOPOLY POWER IN THE RELEVANT MARKETS

Evidence was presented indicating there was a relatively low level of cross elasticity between the retail price of the Journal newspapers and the demand for suburban dailies.[7] In other words, as the price of the Journal's newspapers increased, demand for other suburban dailies did not increase but remained relatively the same.

■ An additional inference of monopoly power can be made from an overwhelming market share. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). The Journal's market share is remarkably impressive. If the product market is limited to newspapers of general circulation, *i. e.*, the Journal's newspapers and out–of–town dailies, the Journal's share might be approximately ninety percent. Including all Rhode Island dailies, the percentage is not less than sixty–five percent.

■ Defendants data again speak from a different perspective. Its figures concern "household penetration," *i. e.*, the percentage of Rhode Island households which receive its newspapers. The range is from a low of twenty percent for *The Providence Journal* to a high of sixty–two percent for *The Providence Sunday Journal.* While these figures are less than those usually held to establish monopoly power, *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945), Plaintiffs observe that these figures measure not Defendants' share of the newspaper–buying public but include the entire public at large. ·Market share should not be measured by absolute population figures, but should reflect the number of those who demonstrate an actual

or potential interest in the market in which the competition is measured.

The Court concludes Plaintiffs have shown evidence of the probable existence of monopoly power.

## MONOPOLIZATION

■ Monopolization in contravention of § 2 occurs whenever one with monopoly power commits an unreasonable restraint of trade in violation of § 1. *United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295, 342 (D.Mass.1953), *aff'd*, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954). As stated earlier, there is credible evidence indicating Defendants violated § 1 under both *per se* and Rule of Reason analysis.

■ In *United Shoe* Judge Wyzanski also discussed another analysis by which a § 2 violation could be found: monopoly power plus exclusionary practices. *Id.* at 342. Such exclusionary practices would be evidence of willful maintenance of monopoly power. Such exclusionary practices need not rise to the level of a § 1 violation. Therefore, even if Defendants' vertical integration were found not to be violative of § 1, it might nonetheless support a § 2 claim inasmuch as it would raise barriers to entry to some extent in the product market. *See* discussion at 300–301, *supra. United States v. Griffith,* 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948); *see also FTC v. Proctor & Gamble Co.*, 386 U.S. 568, 578, 87 S.Ct. 1224, 1230, 18 L.Ed.2d 303 (1966); *Byars v. Bluff City News Co., Inc.*, 609 F.2d 843, 859–64 (6th Cir. 1980).

## ATTEMPT TO MONOPOLIZE

■ Plaintiffs further allege Defendants are attempting to monopolize the secondary distribution market. This too would be a violation of § 2. The standard employed in these cases is whether there is a specific intent to monopolize as well as a dangerous probability of success. *Lorain Journal Co. v. United States*, 342 U.S. 143,

---

**7.** No testimony was offered concerning the cross elasticity between the Journal's newspapers and the out–of–state dailies.

154–55, 72 S.Ct. 181, 186–87, 96 L.Ed. 162 (1951); *Union Leader Corp. v. Newspapers of New England, Inc.*, 180 F.Supp. 125, 140 (D.Mass.) *aff'd in part, rev'd in part*, 284 F.2d 582 (1st Cir. 1960), *cert. denied*, 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744 (1961). Specific intent to monopolize however, can be inferred when the natural outcome of Defendants' actions is the elimination of competition. *Lorain Journal* 342 U.S. at 154, 72 S.Ct. at 186; *United States v. Griffith*, 334 U.S. 100, 105, 68 S.Ct. 941, 944, 92 L.Ed. 1236 (1948). It appears the natural result of Defendants' vertical integration would be the elimination of potential competition of distributors *inter se.*[8] Further, such an integration would eliminate potential competition between Southern New England and the independents.

Without a doubt, if the integration is completed, Defendants will possess a monopoly in the field of newspaper distribution. Thus it appears Plaintiffs might well demonstrate an attempt to monopolize the secondary market. Plaintiffs allegation of attempted monopolization is further bolstered. The case at bar involves two vertically related markets: the publication and distribution of newspapers in Rhode Island. Plaintiffs allege Defendant Journal is using its position of dominance in the primary market to achieve dominance in the secondary market. A leading case in this area of antitrust law involving two vertically related markets is *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). In that case defendant was an electrical utility company and a monopolist with respect to power transmission. After a number of years of supplying power at the retail level, Otter Tail was informed by a number of municipalities that it would be needed only for wholesale purposes and that the municipalities would serve as retailers. Otter Tail refused to sell to the municipalities.[9] The Court found

Otter Tail attempted to monopolize the secondary market when it refused to deal with the municipalities. The facts of *Otter Tail* could be found to be similar with those of in this action. Thus it appears Plaintiffs might well demonstrate a § 2 violation by Defendants' attempt to monopolize.

## STATE LAW CLAIMS

### 1. Antitrust Allegations.

■ Rhode Island law incorporates interpretations of the federal antitrust statutes. R.I.Gen.Laws § 6–36–2(c) (Supp. 1980). Consequently, the potential for proof of a violation of Rhode Island law is the same as that for a violation of §§ 1 and 2 of the Sherman Act 15 U.S.C. §§ 1, 2. No further discussion is necessary.

### 2. Tortious Interference with Business Relations.

■ Plaintiffs also seek to prevent Defendants from using Plaintiffs' customer lists. That customer lists are a property right to be protected from misappropriation is beyond dispute. *Colonial Laundries, Inc. v. Henry*, 48 R.I. 332, 138 A. 47 (1927). The rationale behind such protection is the likelihood that absent interference, "route customers will continue to patronize the same supplier . . . ." *Go–Van Consolidators, Inc. v. Piggy Back Shippers*, 111 R.I. 697, 699, 306 A.2d 164, 165 (1973). Not all customer lists, therefore, are to be protected but only those of a confidential nature, *i. e.*, those which are comprised of customers

> whose trade and patronage have been secured by years of business effort and advertising, and the expenditure of time and money, constituting a part of the good–will of a business which enterprise and foresight have built up . . . .

*Callahan v. R. I. Oil Co.*, 103 R.I. 656, 660, 240 A.2d 411, 413 (1968), (quoting *Town & Country House & Home Service, Inc. v.*

---

**8.** The testimony indicates there is practically no competition among distributors. For obvious reasons maintenance of such a condition was never an express condition of either the relationships among distributors or between distributors and the Journal.

**9.** Otter Tail also refused to "wheel" power to Plaintiffs, that is, it refused to transmit to Plaintiffs power generated by others, and engaged in harassing litigation.

*Newberry*, 3 N.Y.2d 554, 558, 147 N.E.2d 724, 726, 170 N.Y.S.2d 328, 331 (1958)).

The credible testimony reveals that Plaintiffs' customer lists could be found to be protected lists. Over the years distributors nurtured and cultivated their customers whose names comprised the lists. Further, when distributorships were sold, the customer lists were a significant element of the purchases. Indeed, Defendants' contract to purchase distributorships from willing parties evidence a recognition of the Seller's proprietary interest in its list.

## CONCLUSION

Plaintiffs have demonstrated adequate grounds for the issuance of a Preliminary Injunction. They have established that they will suffer irreparable harm if Defendants are not enjoined, the balance of harm tips in direction of the Plaintiffs, they have established a public interest which requires preliminary relief, and they have produced credible evidence which upon hearing of the merits, if accepted, will result in their ultimate success. If relief were not now granted, Plaintiffs claim to remain in business would be essentially moot. These circumstances warrant a preliminary injunction. Whether or not Plaintiffs will prevail is to be determined after a full opportunity for discovery and a full exposition of the facts. Accordingly, Defendants are enjoined from refusing to deal with Plaintiffs and from using Plaintiffs' customer list pending a hearing on the merits of this action.

Plaintiffs shall prepare and present a form of Order in accord with this Opinion.

SO ORDERED.