David L. McMORRIS, M.D., Plaintiff,

v.

The WILLIAMSPORT HOSPITAL, et al., Defendants.

Civ. No. 79–0438.

United States District Court, M.D. Pennsylvania.

Sept. 25, 1984.

Marc G. Tarlow, Markowitz & Seiden-sticker, P.C., York, Pa., for plaintiff.

Herbert C. Goldstein, Harrisburg, Pa., and G. David Rosenblum, Astor, Weiss & Newman, Philadelphia, Pa., for John V. Calce, M.D.

Joseph A. Torregrossa, Morgan, Lewis & Bockius, Philadelphia, Pa., for all other defendants.

David R. Bahl, McCormick, Reeder, Nicholas, Sarno, Bahl & Knecht, Williamsport, Pa., for Hosp.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

### INTRODUCTION

The plaintiff commenced the above-captioned civil action on April 10, 1979, naming the Williamsport Hospital, its Board of Trustees, certain of its officers, Dr. Judith Gouldin and Dr. John Calce as defendants. In this suit, the plaintiff challenges, on various grounds, the hospital's decision to replace him as director of its nuclear medicine department, to install Dr. Gouldin in his place and to accord to her the exclusive right to render official interpretations of nuclear scans and to use the rather sophisticated equipment needed to practice nuclear medicine. Some of the claims set forth in the original complaint have been eliminated by virtue of two Orders handed down by the court and a stipulation entered into by the parties. *See* Memorandum and Order dated October 15, 1982, Document 91 of the Record (granting defendants' motion for summary judgment on plaintiff's claim that the hospital breached his employment contract); Order dated July 26, 1982, Document 82 of the Record (dismissing plaintiff's civil rights claims); Stipulation dated December 27, 1982, Document 127 of the Record (withdrawing all claims advanced under Section 2 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 2 (1976)). The claims remaining for the court's consideration are claims under Section 1 of the Sherman Act, 15 U.S.C. § 1 (1976), a breach of contract claim arising from the hospital's by-laws and a tort claim based upon alleged interference with the plaintiff's contract rights.

Presently before the court is a motion for summary judgment filed by the defendants. Summary judgment is "a drastic remedy," *Tomalewski v. State Farm Life Ins. Co.*, 494 F.2d 882, 884 (3d Cir.1974); *accord Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir.1981), and all doubts as to its propriety in a given case must be resolved against the moving party. *See, e.g., United States ex rel. Jones v. Rundle*, 453 F.2d 147, 150 (3d Cir.1971). As the Court of Appeals for the Third Circuit recently stated, "[s]ummary judgment may only be granted if, upon a review of the materials properly before the court, *see* Fed.R.Civ.P. 56(c), and viewing the evidence thus considered in a light most favorable to the non-moving party, the court is convinced that no genuine issue of material fact remains for trial and that the movant is entitled to judgment as a matter of law." *Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir.1983) (citing *Scott v. Plante*, 532 F.2d 939, 945 (3d Cir.1976)). In addressing the instant motion, the court also has considered the general rule that the summary judgment device "should be used sparingly in complex antitrust litigation." *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *accord Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 165 & n. 2 (3d Cir.1979).

Nevertheless, these general rules should not be construed to preclude a court from entering summary judgment in an appropriate situation. Indeed, notwithstanding the caveat that summary judgment rarely should be entered in antitrust cases, *Poller*, 368 U.S. at 473, 82 S.Ct. at 491, a court is obligated to consider carefully a party's Rule 56 motion under the particular facts of the given case and must stand ready, even in antitrust litigation, to enter judgment if appropriate. *First National Bank v. Cities Service*, 391 U.S. 253, 288–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Harold Friedman, Inc. v. Kroger Co.*, 581 F.2d 1068, 1080 (3d Cir.1978). "While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint." *First National Bank*, 391 U.S. at 290, 88 S.Ct. at 1593. Hence, after a movant has produced evidence demonstrating his entitlement to summary judgment, the party resisting the motion must produce affidavits or other admissible materials containing specific facts demonstrating the existence of a genuine triable issue. *Tripoli Co. v. Wella Corp.*, 425 F.2d 932 (3d Cir.) (en banc), *cert. denied*, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970); *see also* Fed.R.Civ.P. 56(e). A failure to do so will result in the entry of summary judgment. *First National Bank*, 391 U.S. at 289, 88 S.Ct. at 1592.

The parties have developed the record substantially, having engaged in extensive discovery during the course of this five-year-old case. The court has carefully reviewed the record in conjunction with the parties' legal arguments and the standard of review discussed *supra*. For the reasons set forth below, the court will grant the defendants' motion for summary judgment on all claims except for the plaintiff's claim that the defendants have engaged in an unlawful tying arrangement violative of Section 1 of the Sherman Act.

## FACTUAL BACKGROUND

In the practice of nuclear medicine, radioactive materials are used to diagnose and treat certain illnesses. Unknown before World War II, this medical specialty has become an important diagnostic and therapeutic tool. In therapeutic nuclear medicine, radioisotopes are used to destroy abnormal growths. In diagnostic nuclear medicine, two basic approaches are available. These are called the "in vivo" and the "in vitro" procedures.

When a doctor uses the "in vivo" approach, a radionuclide is introduced into the patient's system through injection or in-

gestion. Using various machines, the physician creates images of the patient or the affected body part at a key point in time following the introduction of the radioactive material. Because these radionuclides have unique properties, it is important for the practitioner to produce the image, or series of images, at the proper moment or moments during the procedure. The physician later interprets the image and arrives at a diagnosis.

In the "in vitro" diagnostic procedure, the physician does not introduce radioactive materials into the patient's body. Rather, a specimen, usually a blood sample, is extracted from the patient. After subjecting the specimen to radionuclides, the physician compares the result with that obtained from tests involving normal or control specimens. *See generally* Deposition of George L. Jackson, M.D., dated November 9, 1983 Vol. I at 57–60, Document 256 of the Record; Deposition of David L. McMorris, M.D., dated November 18, 1980 to November 21, 1980 [hereinafter cited as First McMorris Deposition] at 13–26, Document 262 of the Record.

In 1960, The Williamsport Hospital began to offer services in nuclear medicine. The plaintiff, who possessed staff privileges at the facility since 1958, served as the primary practitioner of nuclear medicine at the hospital from the time that these services were first offered. The plaintiff and his covering physician were designated as authorized users of radionuclides on the original license filed by the hospital with the Atomic Energy Commission.

Through the years, the plaintiff divided his time and energy between the hospital's nuclear medicine department and his own practice of internal medicine. It appears that the plaintiff eventually was required to concentrate a steadily increasing amount of effort in the area of nuclear medicine. As he stated during his deposition:

In 1960 we got some basic equipment and got the basic procedures that were then available and I made these studies known to the staff and then performed those studies and as the field of nuclear medicine developed we added on more sophisticated equipment through the same application and developed more sophisticated studies. I was available all the time and, in fact, at the outset I performed as a technician and a secretary, a transporter of isotopes from the air field; did the procedures and reported them. As time went along this grew and I adjusted my schedule to meet the demand, both in terms of my office practice and what other things had to be decreased, such as going off the staff at Divine Providence [Hospital] because of the increased responsibilities.

First McMorris Deposition at 124. The plaintiff estimates that by the early to mid-1970's, he had been spending between 60 and 70 percent of his time practicing nuclear medicine. *Id.* at 124–25.

Eventually, it became apparent that the plaintiff would need assistance of some kind in order to continue providing quality care in both the hospital's nuclear medicine department and his own practice of internal medicine. *See, e.g.,* Letter from Plaintiff to Clive Waxman, Jr., President of Williamsport Hospital, (April 19, 1972), Appendix to the Hospital Defendants' Motion for Summary Judgment [hereinafter cited as Defendants' Appendix] at 130a, Document 222 of the Record (plaintiff stated that because of an increasing workload in the department, "it bec[ame] necessary for consideration to be given for full-time coverage ... by a professional man.").

In 1972 and 1973, the plaintiff and various members of the hospital administration attempted to arrive at a solution to the problem regarding appropriate coverage in the nuclear medicine department. The plaintiff believed that the department "would require full attention" but thought that nuclear medicine practitioners necessarily would maintain at least a "limited clinical practice." Letter from Plaintiff to Harry R. Gibson, Chairman of the Board of Managers of The Williamsport Hospital (May 18, 1976), [hereinafter cited as Plaintiff's letter to Gibson] at 5, Defendants' Appendix at 167a; *cf.* Deposition of Plain-

tiff dated October 5, 1981 to October 10, 1981 [hereinafter cited as Second McMorris Deposition] at 120, 122, 126, Documents 253 & 258 of the Record (espousing the view that clinical practice is, as to some patients, inherently allied to the practice of nuclear medicine within a hospital); First McMorris Deposition at 211 (stating that a nuclear medicine practitioner should "[do] clinical medicine as well so that ... [he or she] would be able to do a better job"). In order to provide the desired amount of coverage in the department while allowing time for necessary clinical practice, the plaintiff proposed that another physician be invited to share responsibility for the practice of nuclear medicine in the hospital. Plaintiff's letter to Gibson at 5, Defendants' Appendix at 167a; *see also* Letter from Plaintiff to Clive R. Waxman, Jr., President of The Williamsport Hospital (January 30, 1973), Defendants' Appendix at 177a. To that end, the plaintiff "began recruiting for an associate." Plaintiff's letter to Gibson at 5, Defendants' Appendix at 167a. Although the hospital strongly believed that the department would "require a single full-time physician['s] commitment," Memorandum from Clive R. Waxman, Jr. to Dr. Herman W. Rannels, Vice-President of The Williamsport Hospital at 1 (February 19, 1973), Defendants' Appendix at 132a, the plaintiff's proposal that there be "shared responsibility" eventually was accepted.

The plaintiff became associated with Dr. Prayad Chayapruks in 1974. The two doctors shared a private internal medicine practice and, beginning on July 1, 1974, shared responsibility for the hospital's nuclear medicine department. In an agreement dated July 1, 1974, the hospital and the plaintiff set forth their respective rights and responsibilities concerning the department. In this contract, the plaintiff was named the director of the nuclear medicine department. As such, he was as-signed various administrative responsibilities for which he was given a flat salary or fee of $20,000.00 per year. *See* Agreement between The Williamsport Hospital and Plaintiff dated July 1, 1974, Defendants' Appendix at 135a–136a. In addition, he and Dr. Chayapruks were given the right to "bill privately for professional services, which include doing anatomical markings, making decisions as to appropriate views and timings of imaging and interpretation of results of studies for clinical application." *Id.*, Defendants' Appendix at 136a.[1] The hospital agreed to provide the facilities and personnel necessary for the "proper practice" of nuclear medicine. *Id.* On July 9, 1974, the plaintiff wrote to the medical staff of the hospital advising that the department would "operate with full-time professional personnel" and that he would be available in the department during the morning hours and Dr. Chayapruks would be in attendance in the afternoon. Letter from Plaintiff to the Medical and Dental Staff of The Williamsport Hospital (July 9, 1974), Defendants' Appendix at 137a.

The plaintiff terminated his association with Dr. Chayapruks on June 30, 1975. By letter dated May 29, 1975, the plaintiff indicated that he wished to terminate their joint practice because he was "convinced" that Dr. Chayapruks' "expectations in recognition and rewards [would] be best sought elsewhere in a more regulated academic environment." Letter from Plaintiff to Dr. Prayad Chayapruks (May 29, 1975), Defendants' Appendix at 139a. Dr. Chayapruks remained in Williamsport, however, and continued to work in the hospital's nuclear medicine department, billing patients directly for the services he provided there. It appears that the two doctors maintained a somewhat distant relationship during this time. *See, e.g.,* Hospital Defendants' Request for Admissions Addressed to Plaintiff and Responses Thereto

---

1. Prior to this contract, it appears that the hospital billed patients for all nuclear medicine services and the plaintiff was paid a salary for both his administrative and medical services. First McMorris Deposition at 184–85, Document 262 of the Record; *see* Hospital Defendants' Requests for Admissions Addressed to Plaintiff and Answers Thereto ¶¶ 33–35, Defendants' Appendix at 6a, 20a.

¶ 51, Defendants' Appendix at 8a, 20a (Plaintiff concedes that "[a]fter July, 1975, Dr. Chayapruks and [he] infrequently communicated, and it was uncommon for both physicians to be in the nuclear medicine department at the same time.").

In early 1976, each doctor began to question openly the competence and dedication of the other. In a letter dated January 15, 1976 to the vice-president of the hospital, Dr. Chayapruks stated that the plaintiff was spending only about an hour or so per day in the department and sometimes left it uncovered for an entire day. *See* Letter from Dr. Prayad Chayapruks to Dr. Herman W. Rannels (January 15, 1976), Defendants' Appendix at 141a. He also asserted that the plaintiff lacked the capacity to develop new medical techniques and failed to supervise the department's technicians as required by his directorship contract. *Id.* Finally, he suggested that the hospital should take the plaintiff's yearly income and divide it between two doctors so as to obtain "better coverage and services" in the department. *Id.*

The plaintiff subsequently wrote to the chairman of the hospital's board of managers complaining that someone had allowed Dr. Chayapruks to direct the department while the plaintiff was out of town. The plaintiff asserted that "to charge Doctor Chayapruks with that responsibility is to ignore the very reasons that necessitated my discharging him as an employee. He simply cannot be trusted." Letter from Plaintiff to Harry R. Gibson, Esq. (January 23, 1976), Defendants' Appendix at 143a. On February 17, 1976, the plaintiff wrote to the chairman of the hospital's credentials committee setting forth twelve reasons for his lack of confidence in Dr. Chayapruks' character and performance. *See* Letter from Plaintiff to Dr. Robert L. Vanderlin (February 17, 1976), Defendants' Appendix at 145a–146a. Included among the plaintiff's twelve comments were charges that Dr. Chayapruks "manipulat[ed]" some

of the equipment, failed "to respond to calls" and "attend patients," "improperly advised" a patient, refused to see indigents referred to him from the emergency room and "misrepresented" his background in nuclear medicine. *Id.*

After considering the allegations set forth by the two physicians, the hospital administration conducted an investigation of the work performed within the department of nuclear medicine. Both physicians were found to be competent. *See* Report of Special Executive Committee of the Medical Staff (February 20, 1976), Defendants' Appendix at 148a. After consulting with various administrative and medical committees, however, the hospital's board of managers decided that the plaintiff's directorship contract would be terminated immediately. *See* Letter from Clive R. Waxman, Jr. to Plaintiff (March 18, 1976), Defendants' Appendix at 148a–149a.[2] Notwithstanding that he no longer would possess administrative responsibilities within the department, the plaintiff retained his right of access to the department for professional services. *Id.* Dr. Chayapruks also retained his privileges in this regard. *Id.* Finally, the board directed that a consultant be hired to study the practice of nuclear medicine within the hospital and to recommend appropriate measures to ensure effective operation of the department. *Id.*

The consultant hired to study the department was Dr. Richard Reba, Chairman of the Nuclear Medicine Department at the Washington Medical Center of George Washington University. Hospital Defendants' Request for Admissions Addressed to Plaintiff and Responses Thereto ¶ 57, Defendants' Appendix at 8a & 21a. On May 6, 1976, Dr. Reba submitted his report and recommendations in the form of a letter addressed to the chairman of the hospital's board of managers. *See* Letter from Dr. Reba to Harry R. Gibson (May 6, 1976), Defendants' Appendix at 151a–161a. In

**2.** As noted in the introduction of this Memorandum, *supra*, the court previously entered judgment in favor of the defendants with respect to the plaintiff's claim that the hospital breached the agreement concerning his position as director of the department.

his report, Dr. Reba outlined many specific problems existing within the department and observed that, generally, "the current radioisotope activities at the hospital are not organized in a manner which is likely to allow their optimal development to the levels now possible." *Id.* at 3–4, Defendants' Appendix at 153a–154a. This situation was attributed to the lack of a "single motivating force" in all areas of the operation and the absence of sufficient input by physicians in the area of technical development. *Id.* at 4, Defendants' Appendix at 154a. To remedy the deficiencies of the department, Dr. Reba made several recommendations. With respect to the functions of the medical personnel, Dr. Reba stated, in pertinent part:

A 400 bed general hospital should be able to support a full-time equivalent nuclear medicine physician. My review of the current work load reveals that this is certainly so. The Williamsport Hospital should demand a commitment from its nuclear medicine physician similar to any other hospital based service. I believe the preference would be for a private practice or independent contractor type of arrangement. However, I believe it should be recognized that in many ways nuclear medicine is related to the Medical Staff in a similar fashion as x-ray or pathology in that it is a consultative and service specialty. Therefore, it is in the best interest of the patients, the attending staff and the hospital administrative staff, that nuclear medicine privileges should best be "closed" or departmentalized rather than open and individualized. Although the "closed" arrangement may have avoided the present situation, careful and detailed controls must be included in such an arrangement in order to avoid having a specific individual being in the position of being able to make arbitrary and uncompromising decisions in regard to the operation of a small department.

Since the Williamsport Hospital can support a full-time nuclear medicine physician, you should demand a commitment from your nuclear medicine physician similar to any other hospital based service. Would your or any other 400 bed hospital tolerate a [sic] part-time x-ray or part-time laboratory coverage during the working day? It is unlikely, and you should not be satisfied with less for nuclear medicine, particularly since the total professional fees from the nuclear medicine operation are sufficient to reimburse one physician adequately.

. . . .

I believe the presence of a full-time nuclear medicine director would result in the solution of many of the ... errors of omission in the operation I observed.... [S]ince the nuclear medicine physician is now absent for the majority of the working day, is the Board of Managers willing to assume responsibility for a maladministration of a radioactive substance? For a patient falling off a table? For the wrong test being performed, or the wrong patient being tested? Under the present situation, one or the other physicians responsible for interpretating [sic] the nuclear medicine examination may not be notified or otherwise learn that he is the responsible physician until after a test has been performed and he reports to the department to review his studies on a particular day. I believe that you and all the members of the Board are vulnerable in this regard. All of the above statements I believe strengthen my opinion that you should demand commitment by making the nuclear medicine physician assume a full-time hospital based position.

*Id.* at 8–9, Defendants' Appendix at 157a–159a.

Dr. Reba suggested three options concerning the medical leadership of the department. First, he noted, the hospital could "[c]ontinue the present bipartite operation unchanged." *Id.* at 8, Defendants' Appendix at 158a. He concluded that this option should be rejected. *Id.* Second, Dr. Reba observed that the hospital could offer the position of full-time director to either the plaintiff or Dr. Chayapruks. *Id.* Various criteria were recommended to guide

the hospital in selecting one of the two physicians for the position. *Id.* Finally, Dr. Reba opined, the hospital could appoint a search committee to select a new, full-time director of the department. *Id.* He commented, "[t]he 'market' is somewhat better now than it has been in the past and I believe you would get good applicants." *Id.* He also recommended that both the plaintiff and Dr. Chayapruks be permitted to apply and "complete ... on an equal basis" with the other applicants. *Id.*

After receiving Dr. Reba's report, the hospital administration invited both the plaintiff and Dr. Chayapruks to submit their comments regarding the consultant's observations and recommendations. Both doctors pointed out areas in which they believed that Dr. Reba had made inaccurate statements and reached faulty conclusions or recommendations. *See* Plaintiff's Letter to Gibson, Defendants' Appendix at 162a–170a; Letter from Dr. Prayad Chayapruks to Dr. Herman W. Rannels (May 12, 1976), Defendant's Appendix at 171a–173a. By the same token, however, there was agreement on some of the proposals. For instance, the plaintiff agreed that the department should be "closed," that is, that access to its facilities would be limited to physicians chosen by the hospital. Specifically, the plaintiff stated that "[t]he department should be a closed department, free standing if necessary, and that it be run by a professional on a contractual basis with a fee for service income for his compensation." Plaintiff's Letter to Gibson at 7, Defendants' Appendix at 169a.[3]

The executive committee of the hospital's board of managers met the following month to consider Dr. Reba's report and recommendations. *See* Minutes, Executive Committee of Board of Managers (June 8,

1976), Defendants' Appendix at 77a–78a. The committee unanimously recommended that the full board form a search committee to seek a director of nuclear medicine for the hospital. *Id.* In addition, it was recommended that the director receive $20,000.00 per year as a salary for supervising the department and be permitted to bill patients directly for those procedures "in which he is directly involved." *Id.* The committee also suggested that the hospital provide a guarantee of a minimum income "if necessary to recruit an acceptable candidate." *Id.* Finally, the committee recommended "[t]hat the Director of Nuclear Medicine have an exclusive practice in this hospital's Nuclear Medicine Department with there being at least semi-annually a review of the department's operations by a qualified outside consultant." *Id.*

One week later, the full board of managers conducted its annual meeting. During this meeting, the board considered the report of the executive committee. After amending the report so that it would include a statement that the director of the department must "agree to confine his practice to Nuclear Medicine," the board unanimously voted to approve the executive committee's recommendations. *See* Minutes, Annual Meeting-Board of Managers at 2–3 (June 15, 1976), Defendants' Appendix at 80a–81a. Accordingly, a search committee was formed and began seeking applicants. *See* Minutes, Executive Committee of Board of Managers (July 16, 1976), Defendants' Appendix at 82a–84a.

In January 1977, the plaintiff applied for the position and was interviewed by the committee. *See* Hospital Defendants' Request for Admissions Addressed to Plain-

---

**3.** In their briefs, the defendants have emphasized a number of times that the plaintiff initially had indicated his agreement with the notion that the department should be closed and that the director should have the exclusive right to use its facilities. Of course, as will be seen, *infra,* the plaintiff now challenges that exclusivity. Although the defendants have brought this change of position to the court's attention, they do not appear to be requesting that the plaintiff

be estopped from challenging the exclusivity of the department under the antitrust laws. *Cf. Bernstein v. Universal Pictures,* 517 F.2d 976, 981–82 (2d Cir.1975) (dictum) ("it is highly unlikely that estoppel can be readily allowed to defeat antitrust claims."). Hence, the court draws no inference from the plaintiff's initial agreement with the proposal that the department be closed.

tiff and Answers Thereto ¶¶ 66 & 68, Defendants' Appendix at 10a & 21a.

During the same month, the hospital's medical staff engaged in considerable discussion regarding the "closed" or "exclusive" nature of the department. Specifically, at a meeting of the Department of Medicine, it was decided that "a statement of clarification" should be requested concerning the exclusive rights being offered to applicants for the position of director of the nuclear medicine department. *See* Minutes, Department of Medicine (January 3, 1977), Supplemental Appendix to the Defendants' Motion for Summary Judgment [hereinafter cited as Defendants' Supplemental Appendix] at 348a, Document 237 of the Record. The doctors wanted to learn "whether or not the Hospital can restrict or exclude any one physician from practicing in the Nuclear Medicine Department, or any other department of the Hospital, when the physician is qualified and especially if he has been practicing for some time in the community." *Id.* The executive committee of the medical staff subsequently approved this motion, apparently clearing the way for the physicians to ask the administration for some clarification of the matter. *See* Minutes, Executive Committee of the Medical Staff (January 17, 1977), Defendants' Supplemental Appendix at 347a.

At a meeting of the medical staff on January 26, 1977, this issue was discussed again. The minutes of this meeting provide, in pertinent part:

Dr. Sanders' motion that a statement of clarification from the Joint Board/Staff Committee as to the exclusive rights in the Department of Nuclear Medicine being offered to candidates for Director of this Department, be requested, was discussed.... Mr. Waxman [, the president

of the hospital,] stated that the "exclusive rights" means simply that if a person is appointed to be professionally responsible for the department, that person also has the authority to decide who works in that department. Dr. Sutliff asked if all department heads now have exclusive rights. Mr. Waxman stated all service department heads do have exclusive rights.

Dr. Williams stated that the definition of "exclusive rights" has been defined to the whole staff by Mr. Waxman and now the staff needs to either accept or reject this definition. Also, the [s]taff must decide how it feels about Dr. McMorris and his rights if he is not appointed Director.

Dr. Williams asked for a motion to accept for the definition of "exclusive rights," Motion was seconded and a count was called for. There were 27 for, 12 against. Motion passed.

Business Minutes, Staff Meeting, (January 26, 1977), Defendants' Appendix at 176a–1—176a–2.[4]

By letter dated February 11, 1977, Dr. Judith Gouldin applied for the position. *See* Letter from Dr. Judith Gouldin to John E. Person, Chairman, Nuclear Medicine Search Committee (February 11, 1977), Plaintiff's Appendix, Exhibit 5. Dr. Gouldin was interviewed in March 1977, *see* Hospital Defendants' Request for Admissions Addressed to Plaintiff and Responses Thereto ¶ 70, Defendants' Appendix at 10a & 21a, and was offered the position, *see* Minutes, Board of Managers, (March 16, 1977), Defendants' Appendix at 85a–86a. The hospital and Dr. Gouldin reached an agreement which was set forth in writing on April 15, 1977. The agreement provided, *inter alia:*

---

**4.** At a meeting of the Department of Medicine, conducted on February 7, 1977, there again was some discussion concerning the definition of exclusive rights. Mr. Waxman's definition, accepted by the medical staff during its January 26, 1977 meeting, was read to the Department of Medicine and was discussed. During this discussion, "Dr. McMorris stated that he ha[d] no

contest with the definition of 'exclusive rights.' " Business Minutes, Department of Medicine (February 7, 1977), Plaintiff's Appendix, Exhibit 4, Document 225 of the Record. As noted in footnote 3, *supra*, the court will draw no inference adverse to the plaintiff from his statement regarding exclusivity of the department.

[–] The Director [Gouldin] will serve in a full-time capacity in the Nuclear Medicine Laboratory having no outside professional responsibility.

[–] The Director will have an exclusive practice in the Department of Nuclear Medicine. The granting of additional privileges and (or) the addition of an associate or associates will be the sole responsibility of the Director with the approval of the Board of Managers.

Agreement between the Williamsport Hospital and Judith A. Gouldin, M.D., dated April 15, 1977, Plaintiff's Appendix, Exhibit 6. This contract provided that Dr. Gouldin would receive a salary of $60,000.00, subject to reconsideration for a possible increment after six months. *Id.* Dr. Gouldin's salary, it appears, was not tied in any way to the number of procedures she performed or the number of patients receiving treatment in the department. In addition, there was no provision allowing her to bill patients for any services she might perform. *See id.* Finally, the agreement was to run for one year, subject to automatic yearly renewals or termination with 120 days notice. *Id.* Dr. Gouldin's contract has been renewed every year to date and she has received salary increases based upon the inflation rate. *See* Excerpt from Deposition of Dr. Judith A. Gouldin included in Defendants' Appendix at 191a–192a.

Dr. Gouldin began working at the hospital on July 15, 1977. The plaintiff inquired whether he would be permitted to continue providing services within the department. *Id.* at 187a. Dr. Gouldin decided that the

plaintiff would not be allowed to do so. In explaining her decision, Dr. Gouldin stated that "at that time [she] felt there was not a need for another physician, based on the amount of work." *Id.; see also id.* ("The case load was approximately ten nuclear medicine procedures per day, which I felt capable of handling.").[5]

It was, of course, necessary for Dr. Gouldin to arrange for coverage in the department for those occasions on which she would be unavailable. She did not select the plaintiff to cover for her. Rather, she chose Dr. John Calce, who had recently become director of nuclear medicine at the nearby Divine Providence Hospital. *See* Hospital Defendants' Request for Admissions Addressed to Plaintiff and Responses Thereto ¶ 90, Defendants' Appendix at 12a, 22a.[6] In turn, Dr. Calce asked Dr. Gouldin to cover for him at Divine Providence. *Id.* As a result of this cross-coverage agreement, it was necessary for the hospital to amend the license filed with the Nuclear Regulatory Commission (NRC) to reflect the fact that Drs. Gouldin and Calce would be authorized to use the facilities of the department. Significantly, the plaintiff's name was removed from the license.

## DISCUSSION

The plaintiff alleges that the exclusivity accorded to Dr. Gouldin and the concomitant removal of his name from the NRC license effectively barred him from practicing nuclear medicine at the hospital.[7] Advancing various antitrust theories, he as-

---

**5.** Notwithstanding Dr. Gouldin's right of exclusivity, certain physicians would order tests to be performed within the department and request that the plaintiff interpret the results. It appears that Dr. Gouldin would not honor such requests and would interpret the tests herself on the ground that "it was her department." Deposition of Lura Ludwig, dated March 9, 1982 at 27–28, 39, Document 255 of the Record, *see* Deposition of Dr. Franklin G. Wade, dated January 21, 1983, Document 261 of the Record.

**6.** Unlike the "closed" or "exclusive" department at The Williamsport Hospital, the nuclear medicine facilities at Divine Providence are "open" to all qualified physicians. *See* Excerpt from Deposition of Sr. Emilene, Administrator of Divine

Providence Hospital included in Defendants' Appendix at 231a–232a, *cf.* Excerpt from Deposition of Dr. John Calce included in Defendants' Supplemental Appendix at 367a–369a (noting that other physicians continued to possess privileges after he became director and that some physicians thereafter applied for and received privileges to practice in the nuclear medicine department). The record indicates that the plaintiff subsequently applied for privileges at Divine Providence but decided to abandon his application before the hospital could act upon it.

**7.** The plaintiff now practices nuclear medicine and internal medicine in Arizona.

serts that this constitutes a violation of Section 1 of the Sherman Act for which the defendants are liable to respond in treble damages and attorneys fees.[8] The plaintiff also avers that the defendants effectively abridged his staff privileges at the hospital.[9] Invoking the corporate by-laws of the hospital and the by-laws of the medical staff, the plaintiff asserts that the failure of the defendants to accord to him a hearing regarding the purported loss of privileges is tantamount to a breach of contract. Finally, the plaintiff alleges that the defendants tortiously interfered with his contractual relations with patients and referring physicians by refusing to allow him to practice nuclear medicine in the department.

### THE SHERMAN ACT CLAIM

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is ... illegal." 15 U.S.C. § 1 (1976). The language of Section 1, if taken literally, would invalidate all contracts because "restraint is the very essence of contract." *National Society of Professional Engineers v. United States*, 435 U.S. 679, 687–88, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978); *Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879, 890 (3d Cir.), *cert. denied*, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981). In *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), however, the Supreme Court held that only "unreasonable" restraints of trade fall within the ambit of Section 1. *See id.* at 60, 31 S.Ct. at 515. This is known as the "rule of reason." Under the rule of reason, courts must engage in a frequently complex analysis of

the restraint in issue. *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). In *Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918), Justice Brandeis, writing for the Court, set forth a number of factors used in determining whether a restraint passes scrutiny under the rule of reason. He stated:

> [T]he court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

*Id.* at 238, 38 S.Ct. at 243. It is well recognized that the courts are ill-suited to engage in the searching economic analysis frequently required by the rule of reason. *See, e.g., United States v. Topco Associates*, 405 U.S. 596, 609–10 & n. 10, 92 S.Ct. 1126, 1134 & n. 10, 31 L.Ed.2d 515 (1972) (implying that the rule of reason forces courts "to ramble through the wilds of economic theory" and noting that the judiciary is "of limited utility in examining difficult economic problems").

Through the years, certain types of trade restraints consistently failed to withstand scrutiny under the rule of reason. Because these restraints always were found to have a "pernicious effect on competition" without "any redeeming virtue," *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), the courts began to classify them as "per se" or conclusively unreasonable, and hence unlawful, under Section 1. This per se analysis obviated the need for courts examining

---

**8.** 15 U.S.C. § 15 provides:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover three-

fold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

**9.** Although he was not allowed to perform nuclear medicine procedures, the plaintiff retained his right to practice internal medicine after Dr. Gouldin became the director of the nuclear medicine department.

certain restraints to engage in the "judicially burdensome rule of reason inquiry." Note, *The Facial Unreasonableness Theory: Filling the Void Between Per Se and Rule of Reason* [hereinafter cited as Note, *Facial Unreasonableness Theory*], 55 St. John's L.Rev. 729, 739 (1981) (footnote omitted); *see also Northern Pac. Ry. Co. v. United States*, 356 U.S. at 5, 78 S.Ct. at 518 (observing that the per se approach "avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable— an inquiry so often wholly fruitless when undertaken").

Under the per se rule, the Supreme Court has declared that a number of restraints are, as a matter of law, unreasonable for Section 1 purposes. These include price fixing, *see United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), tying arrangements, *see Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); group boycotts, *see Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), and horizontal divisions of markets, *see United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). In the instant case, the plaintiff asserts that the defendants have engaged in illegal tying and have participated in a group boycott. Hence, he argues, their conduct should be invalidated under the per se analysis. In addition, he contends, the agreement between Dr. Gouldin and the hospital is an "exclusive dealing" contract which runs afoul of Section 1 under the rule of reason approach. The court will examine each of these theories of antitrust liability.

### THE TYING CLAIM

■ A tying arrangement exists when a seller agrees to sell one product, the "tying" product, only on the condition that the buyer also purchase a different product, the "tied" product. *Northern Pac. Ry. Co. v. United States*, 356 U.S. at 5, 78 S.Ct. at 518, *see also United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 617–22, 97 S.Ct. 861, 866–68, 51 L.Ed.2d 80 (1977); *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 605, 73 S.Ct. 872, 878, 97 L.Ed. 1277 (1953).[10] In the instant case, the plaintiff asserts that the defendants have engaged in a tying arrangement because the hospital requires its nuclear medicine patients to use the services of Dr. Gouldin. Under the plaintiff's theory, then, the hospital "ties" the use of nuclear medicine facilities (the tying product) to the use of Dr. Gouldin's services (the tied product). *See* Plaintiff's Memorandum in Opposition to Defendants' Motion at 50 Document 224 of the Record.[11]

---

**10.** A tying arrangement also is said to occur when the buyer is forced to agree that he will not purchase the tied product from anyone other than the seller of the tying product. *Northern Pac. Ry. Co. v. United States*, 356 U.S. at 5–6, 78 S.Ct. at 518; Note, Facial Unreasonableness Theory, *supra*, at 741 n. 82.

**11.** Some of the assertions made in the parties' briefs have tended to obscure the true issue in this case regarding the purported tying arrangement. For instance, the plaintiff has argued, at various points during this litigation, that the defendants have tied the use of the hospital itself to the use of the nuclear medicine department. *See, e.g.*, Letter from Plaintiff's counsel to Court (June 15, 1984) at 3, Document 270 of the Record ("[I]t would seem that a factual issue arises as to whether Williamsport [Hospital] forced customers to buy a second unwanted product (their nuclear medicine services) in order to get total hospital care."). There is no genuine issue of material fact concerning the tying of nuclear medicine services to general hospital services. The record clearly belies any assertion that such a tie exists in this case. Indeed, the plaintiff's economic expert has conceded that a patient who does not need nuclear medicine services is not forced to buy such services as a price for receiving hospital care generally. *See* Deposition of Harry E. Frech dated July 27, 1983 at 131–32, Document 241 of the Record.

A matter raised by the defendants also must be clarified in connection with the tie-in claim. The defendants assert that there is no concerted action with respect to the purported tying arrangement because Dr. Gouldin is an employee of the hospital. *See, e.g.*, Letter from Defendants' counsel to Court (April 5, 1984) at 1–2,

■ Under the Supreme Court's analysis of tying arrangements, a per se violation of Section 1 can be established if the use of nuclear medicine facilities in the hospital and Dr. Gouldin's services are two distinct products *and* if those two products are linked by the hospital's refusal to sell them separately *and* if the hospital possesses such economic power in the market for nuclear medicine services (the tying product) that it effectively can force its patients to "buy" Dr. Gouldin's services (the tied product), thereby restraining competition in the market for nuclear medicine physicians' services. *See United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. at 617–22, 97 S.Ct. at 866–68; *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 501, 89 S.Ct. 1252, 1257, 22 L.Ed.2d 495 (1969); *Times-Picayune Publishing Co. v. United States*, 345 U.S. at 614, 73 S.Ct. at 883. The defendants argue that only one product is involved here, *see* Letter from Defendants' counsel to Court (April 5, 1984) at 3–4, Document 263 of the Record, and that patients are not "forced" to use Dr. Gouldin's services, *id.* at 4. Recently, in *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, — U.S. —, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), the Supreme Court considered a tying case in which both the "distinct products" question and the "forcing" question were critical issues.

In *Hyde*, a hospital entered into a contract in which it was agreed that all anesthesiological services required by patients would be provided by Roux & Associates ("Roux"), a firm of anesthesiologists. Dr. Edwin Hyde, an anesthesiologist who was not a member of Roux, was denied admission to the hospital's medical staff because of the exclusive contract. Dr. Hyde sued, invoking Section 1 of the Sherman Act. The doctor asserted that the parties engaged in unlawful tying because surgical patients using the hospital's operating facilities were not permitted to employ any anesthesiologist who was not associated with Roux.

In deciding whether two discrete products were involved, the Court observed that the inquiry must focus upon the "character of the demand" for the two medical services involved rather than upon the "functional relation" between them. *Id.* at —, 104 S.Ct. at 1562. Indeed, the Court reasoned, there could be no tying arrangement unless potential buyers identified the two types of services as distinct *and* desired to purchase them separately. *See id.* at — – —, 104 S.Ct. at 1562–65. To support its conclusion that there was a sufficient demand for anesthesiological services separate from the market for general surgical services, the Court looked to a number of factors.

First, the Court noted, "[t]here was ample and uncontroverted testimony that patients or surgeons often request specific anesthesiologists to come to a hospital and provide anesthesia." *Id.* at —, 104 S.Ct. at 1564. Second, the anesthesiological services were billed separately from the services provided by the hospital. *Id.* Third, the record showed that other hospitals allowed the services to be purchased separately. *Id.* at — n. 39, 104 S.Ct. at 1564 n. 39. Finally, the Court observed that most anesthesiologists are "fee-for-service practitioners" who do not have financial relationships with hospitals. *Id.* at — –

Document 263 of the Record. Although concerted action clearly must be established in a Section 1 case, *see* text at 913–915 *infra,* this element of the tying arrangement may be proven in the instant litigation without reference to Gouldin's contractual relationship with the hospital. Indeed, the hospital's relationship with its patients may constitute concerted action. *See, e.g., Jefferson Parish Hospital Dist. No. 2 v. Hyde,* — U.S. —, — & n. 28, 104 S.Ct. 1551, 1561 & n. 28, 80 L.Ed.2d 2, 4389 & n. 28 (1984). The defendants appear to argue that the plaintiff has failed to establish any agreement between the hospital and its patients. *See* Defendants' Reply Memorandum at 65, Document 236 of the Record. Significantly, however, on a motion for summary judgment, it is the moving party who bears the initial burden of negating the presence of an element of a claim. Hence, the defendants must demonstrate the absence of an agreement between the hospital and its patients before the plaintiff assumes the burden of producing any evidence to show that there is a genuine issue for trial. *See* text at 900–901 *supra.*

—— n. 36, 104 S.Ct. at 1564 n. 36. These factors, the Court concluded, pointed to the fact that anesthesiological services and the general surgical services provided by a hospital are distinct products.

In the instant case, the question appears much closer. In The Williamsport Hospital, patients are not billed separately for Dr. Gouldin's services. Unlike the consumers in *Hyde*, Dr. Gouldin's patients receive one bill which covers both her services and the use of the facilities of the nuclear medicine department. In addition, Dr. Gouldin is a salaried employee of the hospital. In *Hyde*, the Supreme Court noted that salaried anesthesiologists have become the exception. *Id.* These factors seem to militate against the conclusion that Dr. Gouldin's services and the hospital's nuclear medicine facilities are distinct products.

Nevertheless, the court finds that there is at least a factual question concerning the existence of discrete products in this case. First, there is, as in *Hyde*, uncontroverted testimony in the record showing that certain physicians requested that the plaintiff, rather than Dr. Gouldin, perform nuclear medicine procedures. These physicians, it appears from the record, stopped making these requests only after they realized that Dr. Gouldin's right of exclusivity would preclude the plaintiff from performing these procedures indefinitely. Second, although Dr. Gouldin is a salaried employee, there is no evidence in the record indicating that nuclear medicine physicians generally are salaried. Indeed, the plaintiff was a fee-for-service physician while practicing in the department and the hospital's board of managers originally intended Dr. Gouldin's position to be one in which patients would be billed directly on a fee-for-service basis. *See* Minutes, Annual Meeting-Board of Managers (June 15, 1976), Defendants' Appendix at 79a–81a; Minutes, Executive Committee of Board of Managers (June 8, 1976), Defendants' Appendix at 77a. Finally, as in *Hyde*, the record at this point shows that other hospitals allow nuclear medicine services to be purchased separately. *See* Excerpt from Deposition of Dr. John Calce, included in Defendants' Appendix at 218a–220a; Deposition of Dr. George L. Jackson, Vol. II, dated November 10, 1983 at 43, Document 254 of the Record.

Inasmuch as the court has found a factual issue concerning the existence of two distinct products, we now must proceed to the defendants' other ground for the entry of summary judgment on the tie-in claim, *viz.*, that patients in The Williamsport Hospital are not "forced," within the meaning of the *Hyde* case, to purchase Dr. Gouldin's services. In *Hyde*, the Supreme Court emphasized that the tying arrangements may be considered per se illegal only "when the seller has some special ability—usually called 'market power'—to force a purchaser to do something that he would not do in a competitive market." —— U.S. at ——, 104 S.Ct. at 1558. For instance, if a seller possesses a patent for one product, he has great market power in that product market since he has the exclusive right to sell the item. *See id.* at ——, 104 S.Ct. at 1560–61. When the seller conditions sales of his product upon a buyer's agreeing to take a second product, the purchaser obviously is forced to take the second item, for he may have nowhere else to turn in order to get the first item. This is an impermissible situation because the seller is using his market power in the first (tying) product to restrain competition in the second (tied) product.

■ The instant defendants assert that the plaintiff has not demonstrated that the hospital possesses the degree of market power in the tying product (nuclear medicine services) necessary to "force" purchases of the purported tied product (Dr. Gouldin's services). Specifically, the defendants contend that the plaintiff has not identified an "advantage" possessed by the hospital which is "not shared by its competitors in the market for the tying product." *United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. at 620, 97 S.Ct. at 867; *see* Defendants' Reply Memorandum at 66–67, Document 236 of the Record. It is true that a seller's "unique advantage" in a market can lead, in some cases, to an infer-

ence that he possesses the great degree of market power critical to a finding of illegal tying. 429 U.S. at 620–22, 97 S.Ct. at 867–68; *see Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. at 505 & n. 2, 89 S.Ct. at 1259 & n. 2. What the defendants fail to recognize, however, is that a showing of a unique advantage in the tying product is not indispensable in these cases. Indeed, an alternative showing that the seller's share of the market is very high can lead to an inference that he possesses the kind of market power necessary to engage in illegal tying. *Jefferson Parish Hospital Dist. No. 2 v. Hyde,* —— U.S. at ——, 104 S.Ct. at 1560–61; *see Times-Picayune Publishing Co. v. United States,* 345 U.S. at 611–13, 73 S.Ct. at 881–83.

After carefully reviewing the evidence concerning the hospital's share of the nuclear medicine market, *i.e.,* the tying market, the court concludes that there is a genuine issue of fact regarding market power.[12] Initially, the court notes that the defendants have agreed, for purposes of this motion only, that the relevant geographic market is Lycoming County, Pennsylvania. Within that market, there are four hospitals, The Williamsport Hospital, Divine Providence Hospital, Jersey Shore Hospital and Muncy Valley Hospital. *See* Preliminary Report of H.E. Frech, III, [hereinafter cited as Preliminary Report], Plaintiff's Appendix, Exhibit 1. There is evidence in the record showing that, from July 1976 to July 1979, The Williamsport Hospital possessed a 55–60% of the market share with respect to diagnostic nuclear medicine procedures. *Id.* (Table 6). Perhaps more importantly, there is evidence tending to show that certain procedures are performed only at The Williamsport Hospital, *see* Excerpt from Deposition of Dr. John Calce, included in Defendants' Appendix at 227a–1—227a–2, and that the hospi-

tal's share in the market for therapeutic procedures has increased from 47.4% to 100% in the three-year period from July 1976 to July 1979. *See* Preliminary Report (Table 6). While the defendants may wish to contest these figures and have reserved expressly their rights to argue that the relevant geographic market is broader, the court concludes that, on the present record, there is a genuine issue of fact concerning the hospital's market power. Accordingly, the motion for summary judgment will be denied as to the tying claim.

## THE GROUP BOYCOTT CLAIM

■ It is perfectly permissible under the Sherman Act for one business entity to refuse to deal with another business entity. *E.g., Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164, 167 (3d Cir.1979) (citing *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919)). Section 1 in particular cannot be used to scrutinize such unilateral activity, for the provision, by its own terms, reaches only the concerted acts of two or more entities. The statutory language regarding "contracts," "combinations" and "conspiracies" has been characterized as "an alliterative compound noun, roughly translated to mean 'concerted action.'" *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981) (quoting L. Sullivan, *Antitrust* 312 (1977)); *Harold Friedman, Inc. v. Kroger Co.,* 581 F.2d at 1072 n. 3 (same). Unless the plaintiff can show concerted, rather than unilateral, activity, there can be no liability under Section 1. *Fleer Corp. v. Topps Chewing Gum, Inc.,* 658 F.2d 139, 153 (3d Cir.1981), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982); *Tose v. First Pennsylvania Bank, N.A.,* 648 F.2d at 893. Chief Judge Aldisert has explained, "[a]s one cannot clap with one

---

**12.** The plaintiff asserts that the requisite market power and concomitant "forcing" can be established by looking to certain "market imperfections" in the health care industry. As the defendants correctly observe, the *Hyde* Court specifically repudiated this approach, *see* —— U.S. at ——, 104 S.Ct. at 1566, and we are therefore bound in the instant case to reject the plaintiff's position. *See* Letter from Defendants' counsel to Court (April 5, 1984) at 3, Document 263 of the Record.

hand, and as it takes two to tango, so in a § 1 case there must be proof of more than solitary conduct; there must be proof of concerted action." *Tose,* 648 F.2d at 893. Hence, if the hospital in the instant case unilaterally refused to deal with the plaintiff, there is no right of recovery under Section 1. *United States v. Colgate & Co.,* 250 U.S. at 307, 39 S.Ct. at 468; *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d at 110–11; *Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d at 167.

The instant plaintiff, however, does not allege that the hospital unilaterally refused to deal with him. Rather, he attempts to invoke the per se rule of illegality which pertains to "group boycotts." The requirement of concerted action is brought into even sharper focus in a Section 1 case involving a group boycott, for this category of trade restraint is specifically defined as a *concerted* refusal to deal. *See, e.g., Fleer Corp. v. Topps Chewing Gum, Inc.,* 658 F.2d at 148 n. 14. *See generally Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

To support his theory, the plaintiff asserts that the hospital and Dr. Gouldin, the hospital and its medical staff, the medical staff alone or the hospital and Dr. Calce "conspired" or "acted in concert" to exclude him from the market through a refusal to deal. The defendants contend that Dr. Gouldin and the medical staff could not conspire with the hospital to boycott the plaintiff because they acted as agents of the hospital during all relevant events. The court agrees that the requisite concerted action is absent as to the hospital, Dr. Gouldin and the staff. It is generally agreed that officers, agents and employees of a business "are legally incapable of conspiring among themselves or with their firm in violation of section I." Note, *"Conspiring Entities" Under Section 1 of the Sherman Act,* 95 Harv.L.Rev. 661, 661 (1982); *see, e.g., Copperweld Corp. v. Independence Tube Corp.,* — U.S. —, — & n. 15, 104 S.Ct. 2731, 2741 & n. 15, 81 L.Ed.2d 628 (1984); *Tose v. First Pennsylvania Bank, N.A.,* 648 F.2d at 893–94. It is clear that Dr. Gouldin acted as an employee of the Hospital at all relevant times. Similarly, it appears that the medical staff acted as a unit or an "arm" of the Hospital during all relevant events rather than as individual practitioners acting on their own behalf or as independent contractors.

█ Although there has been some suggestion that an employee or agent can be found to have conspired with his employer if he has acted "for personal reasons," *see Johnston v. Baker,* 445 F.2d 424, 427 (3d Cir.1971), it is clear that such is not the case here, for the medical staff members did not compete with the plaintiff in the practice of nuclear medicine and Dr. Gouldin received her fixed salary regardless of the number of procedures she performed. Moreover, even if the court were to find *some* form of concerted action here, the evidence shows clearly that the decision to close the department and offer its director an exclusive practice arose from Dr. Reba's report and not from any agreement among the parties to exclude the plaintiff from the hospital's nuclear medicine facilities.[13] In order to prove that the defendants have acted in concert to exclude him from practicing nuclear medicine in the hospital, the plaintiff must show that these purported conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d at 111 (quoted with approval in *Monsanto Co. v. Spray-Rite Service Corp.,* — U.S. —, —, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984)). In connection with the instant motion, the defendants have brought forward evidence negating any inference of

---

**13.** The court would note also that the medical staff ultimately expressed its disapproval of Dr. Gouldin's failure to allow the plaintiff to use the hospital's nuclear medicine facilities. *See* Minutes of Staff Meeting (Sept. 28, 1977), Defendants' Appendix at 353. Moreover, it appears that the final authority on the subject of exclusivity rested with the board of managers and not the medical staff. *See* By-Laws of The Williamsport Hospital, Art. II, § 2, Defendants' Appendix at 273a.

such a commitment or scheme between Dr. Gouldin, the medical staff and the hospital administration. Summary judgment is therefore appropriate.

■ The plaintiff also attempts to make out a boycott claim by looking to the cross-coverage agreement between Dr. Gouldin and Dr. Calce.[14] While an agreement between these two physicians would constitute concerted action, it is quite clear that the *cross-coverage* agreement did not preclude the plaintiff from practicing nuclear medicine at either The Williamsport Hospital or Dr. Calce's department at Divine Providence Hospital. The doctors simply agreed that one would cover for the other during weekends, vacations and the like. This does not constitute a boycott of the plaintiff. Although the plaintiff has attempted to demonstrate the existence of a conspiracy by offering a factual scenario in which Drs. Gouldin and Calce formed their cross-coverage agreement before even arriving in the Williamsport area, the court observes that the record does not support the ultimate conclusion that the plaintiff wishes us to draw, for there simply is no evidence supporting the view that this cross-coverage agreement is causally related to the plaintiff's exclusion from the relevant market. Moreover, there is ample

evidence negating the allegation that the agreement was the product of an intention by Drs. Gouldin and Calce to exclude the plaintiff from the practice of nuclear medicine. No contradictory evidence from the plaintiff has been submitted. Accordingly, the motion for summary judgment will be granted as to the plaintiff's group boycott claims.[15]

## EXCLUSIVE DEALING

■ Since the employment contract between Dr. Gouldin and the hospital grants to her the exclusive right to perform the procedures and render the interpretations of the scans produced in the department, the plaintiff asserts that the agreement is an "exclusive dealing" arrangement which must be scrutinized under the rule of reason.[16] As they did in connection with the group boycott claim, *supra,* the defendants respond that there can be no concerted action, and hence no Section 1 liability, when the purported combination is comprised of an employer and his employee.[17] For the reasons set forth, *supra,* in connection with the group boycott claim, the court agrees with the defendants' position.[18]

In addition, the court observes that the hospital's conduct in this case might be

---

**14.** The boycott claim is the only claim asserted against Dr. Calce.

**15.** The court also will grant the defendants' motion for summary judgment on the plaintiff's "essential facilities" claim. Under the essential facilities doctrine, a trader in possession of a facility which cannot be duplicated practicably by his competitors must share it on fair terms in certain cases. *Hecht v. Pro-Football, Inc.,* 570 F.2d 982, 992–93 (D.C.Cir.1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978); *see Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). For obvious reasons, this doctrine is "carefully delimited." *Hecht,* 570 F.2d at 993. It is unnecessary to decide, however, whether the doctrine properly may be applied in the instant case. *But see Pontius v. Children's Hospital,* 552 F.Supp. 1352, 1370 (W.D.Pa.1982) ("[T]he essential facilities doctrine is inapplicable to hospital staff privileges decisions."). First, as to Dr. Gouldin, the medical staff and the hospital, there is no concerted action. This, of course, is fatal to the Section 1 claim whether

the plaintiff relies upon a purported boycott or the essential facilities theory. Second, as to the agreement between Dr. Gouldin and Dr. Calce, there is, for the same reasons as stated in connection with the group boycott theory, no genuine issue of fact concerning the exclusion of the plaintiff from the nuclear medicine facilities of either hospital. The cross-coverage agreement simply did not cause the plaintiff's exclusion.

**16.** Exclusive dealing contracts are scrutinized pursuant to the rule of reason unless they also constitute one of the manifestly anticompetitive trade practices customarily subjected to scrutiny under the per se rule. *Bravman v. Bassett Furniture Industries, Inc.* 552 F.2d 90, 101 (3d Cir.), *cert. denied,* 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1977).

**17.** The defendants contend alternatively that the agreement between Dr. Gouldin and the hospital withstands scrutiny under the rule of reason.

**18.** The cases cited by the plaintiff dealing with restrictive covenants are clearly distinguishable.

likened to that of a trader attempting to accomplish the vertical integration [19] of his business. The court has been unable to find any cases in which the resulting agreement between the trader and his employees constitutes an impermissible restraint of trade within the meaning of Section 1. The cases which the court has found indicate that such agreements do not fall within the ambit of Section 1, partly because they do not involve concerted action. *See Lamarca v. Miami Herald Publishing Co.*, 395 F.Supp. 324, 327–28 (S.D.Fla.) (denying motion for preliminary injunction), *aff'd mem.*, 524 F.2d 1230 (5th Cir.1975); *Millcarek v. Miami Herald Publishing Co.*, 388 F.Supp. 1002, 1005–06 (S.D.Fla.1975) (same); *cf. Ark Dental Supply Co. v. Cavitron Corp.*, 461 F.2d 1093, 1094 & n. 1 (3d Cir.1972) (holding that a decision to sell only to a subsidiary is permissible in the usual case). *But see Auburn News Co., Inc. v. Providence Journal Co.*, 504 F.Supp. 292, 299 & n. 2 (D.R.I.1980) (distinguishing *Lamarca* and *Millcarek* because they involved employees; holding that concerted action can be found when independent contractors are involved rather than employees), *reversed on other grounds*, 659 F.2d 273 (1st Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982).

The court will grant the defendants' motion for summary judgment as to the plaintiff's exclusive dealing claim.[20]

## STATE LAW CLAIMS

Remaining for the court's consideration are the plaintiff's breach of contract and tort claims. These do not require extended discussion.

■ The plaintiff's contract claim is predicated upon the by-laws of the medical staff and of the hospital itself. *See Berberian v. Lancaster Osteopathic Hospital Ass'n*, 395 Pa. 257, 262–65, 149 A.2d 456 (1959). Both sets of by-laws contain procedural provisions governing the granting, denial and withdrawal of staff privileges at the hospital. *See* By-Laws of The Williamsport Hospital, Art. III, § 1, Defendants' Appendix at 276a–277a; By-Laws, Rules and Regulations of the Medical Staff of The Williamsport Hospital, Art. III, § 5, Defendants' Appendix at 246a–247a. The plaintiff asserts that he was entitled to the procedural protections offered in the by-laws because Dr. Gouldin's right to practice exclusively in the department was tantamount to a "reduction of privileges."

A similar claim was advanced in *Adler v. Montefiore Hospital Ass'n*, 453 Pa. 60, 311 A.2d 634 (1973), *cert. denied*, 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974). In *Adler*, a physician was no longer permitted to perform certain procedures because another doctor was granted the exclusive right to do so. The Supreme Court of Pennsylvania held that there was no right to a hearing under by-laws provisions similar to the ones involved in the instant case. 453 Pa. at 80–82. The Court initially noted that the physician's position on the medical staff did not in and of itself confer upon him the right to perform the particular procedures in question. This being the case, the Court reasoned, the physician had only a unilateral expectation of being able to continue to perform the procedures. Noting that "[h]is rights to admit patients and to prescribe treatment, and the remainder of the cluster of privileges accorded to all staff members, have in no way been diminished, but remain in all respects equal to those of other staff members," the Court concluded that there was no reduction in privileges and, thus, no right to the protection offered by the by-laws. *Id.* at 81. In the instant case, the by-laws did not confer upon the plaintiff the right to per-

---

**19.** "Vertical integration is the inclusion within a single firm of two or more stages in the production or distribution of an end product." *Paschall v. Kansas City Star Co.*, 727 F.2d 692, 696 n. 3 (8th Cir.1984).

**20.** The court notes, however, that the exclusive dealing arrangement remains relevant in connection with the plaintiff's claim that the hospital engages in unlawful tying arrangements by forcing its nuclear medicine patients to agree to purchase Dr. Gouldin's services.

form nuclear medicine procedures. After Dr. Gouldin's arrival, the plaintiff retained "the cluster of privileges" possessed by all staff members. Accordingly, the court views the *Adler* case as controlling and will therefore grant the motion for summary judgment on the contract claim.

 The plaintiff also has set forth a tort claim based upon a purported interference with his contractual relations. Under Pennsylvania law, there are four elements to such a claim. The plaintiff must demonstrate the existence of present or prospective contractual relations, an intent on the part of the defendants to harm the plaintiff by interfering with those contractual relations, the absence of a privilege or justification for the interference and damages. *Glazer v. Chandler*, 414 Pa. 304, 307, 200 A.2d 416 (1964) (stating that "numerous cases" emanating from Pennsylvania courts comport with this definition of the tortious interference claim); Restatement (Second) of Torts § 766. In the present case, the plaintiff has conceded that "[a]t no time has [he] had any binding contracts with any prospective patients or any referring physicians whereby such patients were required to use plaintiff's professional services or such referring physicians were obligated to refer patients to plaintiff." Stipulation ¶ 19, Defendants' Appendix at 70a. Moreover, the record belies any claim that any of the defendants acted with an intent to harm the plaintiff's business or contractual relations. The motion for summary judgment on the plaintiff's tort claim will be granted.

An appropriate Order shall enter.

## ORDER

In accordance with the reasoning set forth in the accompanying Memorandum, IT IS HEREBY ORDERED THAT the defendants' motion for summary judgment is denied as to the plaintiff's tying claim under Section 1 of the Sherman Act and granted in all other respects.